**Thadduse Lee HARTRIDGE, James Thomas Cullison & Mark A. Ford, Appellants,**

v.

**UNITED STATES, Appellee.**

**No. 97–CF–1867, 97–CF–2028, 98–CF–153.**

District of Columbia Court of Appeals.

Argued Feb. 3, 2004.

Decided March 23, 2006.

---

Richard K. Gilbert, appointed by the court, for appellant Hartridge.

Annie R. Alexander, appointed by the court, for appellant Cullison.

Joshua D. Greenberg, Washington, with whom Robert A. Long, Jr. and Bruce A. Baird were on the brief, for appellant Ford.

Margaret Chriss, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, were on the brief, for appellee.

Before FARRELL, REID, and GLICKMAN, Associate Judges.

Opinion for the court by Associate Judge REID.

REID, Associate Judge:

These are consolidated appeals by appellants Thadduse Lee Hartridge,[1] James Thomas Cullison, and Mark A. Ford.[2] They were charged with first-degree murder while armed (premeditated) of Andre Wynn, in violation of D.C.Code §§ 22–2401, –3202 (1996);[3] possession of a firearm during a crime of violence (PFCV), in violation of § 22–3204;[4] and carrying a pistol without a license (CPWL), in violation of § 22–3204(a).[5] They were convicted of the lesser-included charge of second-

degree murder while armed, as well as the weapon charges.[6] All of the appellants claim that the trial court (1) improperly allowed the introduction of "other crimes" evidence against them; (2) permitted improper argument by the prosecutor; and that (3) their conviction for carrying a pistol without a license violated their Second Amendment constitutional right to bear arms. Mr. Hartridge also claims that the indictment against him should be dismissed with prejudice because he was denied his Sixth Amendment constitutional right to a speedy trial. Mr. Cullison argues, in addition, that the trial court erred (1) by not granting his motion for judgment of acquittal on the ground that the evidence was insufficient as a matter of law to establish his guilt; and (2) by not disallowing a government witness's identification of him because of an impermissibly suggestive photo array.[7] Mr. Ford also contends that the trial court improperly admitted into evidence the grand jury testimony of a witness, who asserted that Mr. Ford confessed killing Mr. Wynn, even though that witness recanted her grand jury testimony at trial. We affirm the convictions as to all of the appellants.

## FACTUAL SUMMARY

The government presented evidence showing that Andre Wynn was shot to

---

1. Mr. Hartridge's first name also appears in the record as "Thaddeus."

2. The appellants' jury trial lasted for several weeks, beginning on March 12, 1996, with hearings on motions, continuing with the commencement of the evidentiary trial on July 9, 1996, and ending with the jury's verdict on September 16, 1996.

3. Recodified at D.C.Code §§ 22–2101, –4502 (2001).

4. Recodified at D.C.Code § 22–4504(b) (2001).

5. Recodified at D.C.Code § 22–4504(a) (2001).

6. The appellants were sentenced to prison terms of fifteen years to life on the murder conviction, five to fifteen years on the PFCV charge, and four to twelve months for CPWL; all of the charges are to run consecutively.

7. Mr. Cullison's other claims, such as the improper nature of the government's opening argument, its prejudicial decision to call Mr. Wynn's mother to the witness stand, and the trial court's denial of his motion for severance, are unpersuasive, and merit no discussion.

death on November 8, 1993. Leon Shannon testified that he had known Mr. Hartridge, whom he identified in court, for "three or four years maybe," and saw him twice on the day of Mr. Wynn's murder—once in the morning in the "cut leading out to the 200 block of K Street," (in the Southwest quadrant of the District of Columbia) and the second time, later that same day in "[t]he 200 block of K Street" when Mr. Wynn was shot. Mr. Wynn was the "uncle of [Mr. Shannon's] two kids." Mr. Hartridge, who "wasn't acting normal" asked Mr. Shannon how his friend, Shannon Battle, "g[o]t locked up." Mr. Hartridge was "angry." Later, Mr. Shannon observed Mr. Wynn and Mr. Hartridge "close" together and "talking"; his view was unobstructed. The men had "words" and Mr. Hartridge "punch[ed] [Mr. Wynn] in the face." When Mr. Wynn hit Mr. Hartridge, Mr. Hartridge "told [the person who was with him, identified by Mr. Shannon as Mr. Ford] to bust him, kill his a***." Mr. Ford "pulled out a 9–millimeter [gun and] shot [Mr. Wynn] down." Mr. Shannon stated that Government Exhibit 35, a 9–millimeter gun, "looked just like" the one used during the shooting. Mr. Ford shot Mr. Wynn "several times."

A couple of days after the shooting, Mr. Shannon met with Metropolitan Police Department ("MPD") Detective Willie Toland who showed him "two sets of photographs." Mr. Shannon picked Mr. Hartridge out of the first set of photographs, and Mr. Ford from the second set, as the men he saw in the 200 block of K Street on the day of Mr. Wynn's murder. He was "sure" of his identification of these two men.

Mr. Shannon acknowledged on direct examination that he was convicted in 1991 on a charge of possession of cocaine. On cross-examination, defense counsel sought not only to cast doubt on his credibility, but also to raise questions as to the reasons why he was a government witness. For example, he was asked about his September 1995 arrest for possession of marijuana, and his arrest on February 28, 1996, five months before trial in this case, for assault. Both cases were dropped by the prosecution. In addition, Mr. Shannon confirmed that he lived with Mr. Wynn's sister and they have two children. He also acknowledged that he told an investigator for the Public Defender Service that he did not see who fired the shots that killed Mr. Wynn. He explained that he "was not telling [the PDS investigator] nothing in the streets . . . in front of all [those] people." Counsel for Mr. Ford attempted to demonstrate that Mr. Shannon did not actually see who shot Mr. Wynn, and that he did not really identify Mr. Ford's photo as the shooter. And counsel for Mr. Hartridge sought to establish that Mr. Shannon did not hear his client speak with Mr. Wynn on the day of his murder, that he had not described the events of that day accurately, and that he and Mr. Wynn were selling drugs on that day. Both counsel for Mr. Ford and Mr. Hartridge emphasized Mr. Shannon's three-week delay before speaking with the MPD.

Prior to the day of Mr. Wynn's murder, Theresa Givens, another government witness, had seen Mr. Hartridge with two different guns, one which was silver and another which was black and had a brown handle. However, the trial court precluded any testimony, in the presence of the jury, about two guns, or a gun with a silver handle. When she testified before the jury, Ms. Givens identified a picture of Mr. Wynn and related what she saw on the day of his murder.

Ms. Givens was standing near the corner of Delaware Avenue and K Street, when she heard a gunshot. She saw Mr. Wynn "standing up in the street in the middle

... and [he was] turning around in the middle of a circle saying ouch .... He fell to the ground." Mr. Hartridge and Mr. Cullison were standing "[o]ver top of [Mr. Wynn]." While Mr. Hartridge and Mr. Cullison were standing over Mr. Wynn, with their backs toward Ms. Givens, she heard gunfire and witnessed the men "unloading the gun." Mr. Hartridge and Mr. Cullison "went hand-to-hand to each other like they were switching something around." Mr. Hartridge also "was kicking" Mr. Wynn. Mr. Ford was standing nearby in the "cut."

When asked whether she had seen Mr. Hartridge with a gun prior to the day on which Mr. Wynn was shot, Ms. Givens declared that she had seen him with a gun "in [her] mother's house two days before the [shooting]." Sometime after Mr. Wynn's murder, Ms. Givens picked out photographs of Mr. Cullison and Mr. Ford. When shown another group of photographs, Ms. Givens did not tell the police that she recognized the picture of Mr. Hartridge, even though she did, because she "was terrified."

Kivory P. Proctor testified that he was in a back alley on K Street, Southwest on the morning of the day Mr. Wynn was killed. He watched as the police arrested Shannon Battle "in the cut away of Delaware Avenue." About twenty minutes later, he saw Mr. Hartridge, whom he had known for about eight years, in the same back alley with Datwon Paris, Mr. Ford and Mr. Cullison. The men were standing near the home of Mr. Paris' girlfriend. Mr. Hartridge had Mr. Paris "by the collar of the shirt." Mr. Cullison was "within a foot" of Mr. Paris and "had a gun in his hand." It was a "small handgun, black." Mr. Proctor left the alley and eventually walked towards the "cut away" at Delaware and K. There he saw Mr. Wynn "lying on the fence." Mr. Hartridge was "[s]tanding in front of [him]." He also saw Mr. Ford and Mr. Cullison nearby. He spoke with Mr. Wynn and Mr. Hartridge, and then went "[a]cross the street." He "heard gunshots" and "turned around to see where they were coming from." He saw Mr. Ford "shooting the gun, shooting [Mr. Wynn]." Mr. Wynn fell to the ground, and Mr. Proctor "continued to go around the corner to get away from the gunshots." He heard more gunshots, the last three of which were "slower and louder."

Mr. Proctor gave a statement to the police approximately two days after the shooting, but did not identify anyone because he "was afraid to" and "didn't want to get involved." Soon after he gave the statement, he was shown a photo array but did not identify anyone, even though he recognized Mr. Hartridge's picture. However, on December 21, 1993, he attended a lineup and identified Mr. Ford. Some time in February 1994, Mr. Proctor viewed a photo array and picked out Mr. Hartridge. And, on a date that he did not recall, Mr. Proctor was shown other photos and picked out Mr. Cullison.

On the day of the November 1993, murder of Mr. Wynn, Datwon Paris, who had two prior drug convictions (attempted distribution in 1994 and possession with intent to distribute in 1994, as well as a conviction in 1994 for transporting a hand gun during a drug offense), lived in the 900 block of Delaware Avenue, S.W. He saw Mr. Hartridge, whom he identified in court, in a cut beside his house on the day of the murder. Mr. Hartridge was standing with a man named Shannon Battle. When the police arrived on the scene, Mr. Battle "ran through the cut" but was apprehended and "got locked up for having a handgun on him." Mr. Hartridge "started ... going off ..., acting wild, talking to the police ...," but Mr. Paris did not hear what Mr. Hartridge was saying. Mr. Par-

is identified Mr. Cullison and Mr. Ford as persons who also were on the scene.

After Mr. Battle was taken into custody, Mr. Paris went to the alley in back of his house. There he saw Mr. Hartridge, Mr. Cullison and Mr. Ford. Mr. Hartridge was "[r]ight in front of [his] face." Mr. Ford stood beside him and Mr. Cullison was "to [his] back," "right behind [him]." Mr. Paris "saw a gun" in Mr. Ford's hands, and "[a] gun ... [a] .38" in Mr. Cullison's hands. Mr. Paris then returned to his home, but exited his home a few minutes later and stood in the front. From there he heard gunshots, "spaced apart." The first shots sounded as though they came from "a semiautomatic gun" and the next shots from a revolver. Mr. Paris returned to the inside of his home and looked out the back window where he could see the alley. He saw Mr. Cullison "running" with a gun in his hand. Mr. Cullison reversed direction and Mr. Paris saw him "[r]unning back towards the same way he came." Mr. Paris also witnessed Mr. Hartridge "run in a car" which was "parked out back."

## ANALYSIS

### Appellant Hartridge's Speedy Trial Claim

■ Mr. Hartridge's "chief claim ... is that the trial judge erred in denying him a speedy trial in conformance with the Sixth Amendment" to the Constitution of the United States. We begin with the factual context for Mr. Hartridge's claim.

Less than one month after the murder of Mr. Wynn, on December 3, 1993, Mr. Hartridge was presented to the court and ordered to be held without bond. On April 12, 1994, Mr. Hartridge was arraigned and demanded a speedy trial. Counsel for Mr. Hartridge requested a severance in order to expedite his trial date, but the trial court scheduled trial for Mr. Ford and Mr. Hartridge for August 22, 1994.[8] At a status hearing on July 19, 1994, Mr. Ford and Mr. Cullison requested a continuance; Mr. Hartridge objected, but the government did not. The trial court granted the request for a continuance, and a new trial date was set for November 14, 1994.[9]

During an apparent status conference on October 6, 1994, counsel for Mr. Hartridge expressed concern that the new trial date not be altered. And, the trial court mentioned counsel's assertion that "his client ... [was being] depriv[ed] of his right to a speedy trial. ..." On November 14, 1994, the trial judge had to postpone the trial until November 15. But on November 15, Mr. Ford's counsel asked for a thirty-day continuance, which the government and Mr. Hartridge opposed. Without ruling on the motion, the trial court reconvened the following day for a motions hearing. On that day, the trial court indicated that it would hear the motions, but would anticipate a new trial date in December. Eventually, due to scheduling conflicts, the new trial date was set for April 10, 1995.

By January 1995, a new trial judge and a new prosecutor had been assigned to the case. A new trial date of May 31, 1995 was set at a January 27, 1995 status conference. Counsel for Mr. Ford had scheduled leave from January 15, 1995, to March 15, and would be unavailable for trial beginning on March 4. The parties and the trial judge met on April 14, 1995. The necessity of moving the May 31 trial

---

8. At that point, Mr. Cullison had not yet been arrested, and the trial judge noted that the time of the trial might have to be changed. Mr. Cullison was arrested in June 1994.

9. For various reasons relating to the commitments of counsel for all of the appellants, an earlier date could not be set.

date was discussed. Mr. Hartridge again sought a severance so that he could proceed to trial on May 31; his request was denied. A new trial could not be scheduled before October 16, 1995, due again to scheduling conflicts.

Approximately one month after the April 14th conference, Mr. Hartridge filed a "motion to dismiss on speedy trial grounds," requesting a dismissal of the indictment against him, or in the alternative, a severance and trial on the scheduled May 31 date. He provided a partial chronology of events and pointed out, in part, that he had been "continuously incarcerated since his arrest," had "never requested a continuance in his trial," and was "scheduled for trial nearly 22.5 months after his arrest."[10] The government opposed the motion on June 19, 1995, emphasizing that "[j]oinder of cases is favored," and that "[a] period of institutional delay caused by the necessity of a large number of attorneys to coordinate their schedules with a busy trial judge should not be weighed heavily in a case as complex as this one." On June 23, 1995, counsel for Mr. Hartridge reminded the trial court about his speedy trial motion, and the alternative motion for a severance. The court observed that trial was scheduled to go forward on October 16, and inquired whether counsel was "sure [his] severance motion ha[d] significant merit." Counsel responded that he "was requesting a severance not because of independent basis for a severance ..., but ... so that [his] client, who has objected to the continuances, could go forward ahead."

The trial judge acknowledged that he had not "formally definitively ruled, but [that he was] not too apprehensive about the speedy trial issue," because he had "cases with higher priority."

At a status hearing on September 12, 1995, counsel for Mr. Ford and Mr. Cullison announced that they no longer would represent their respective clients.[11] Counsel for Mr. Hartridge asserted that his client "want[ed] to go to trial on the 16th of October" and had lodged a motion to dismiss. The trial court acknowledged his position saying, "you don't want to be dragged along and be denied speedy trial rights." Mr. Hartridge personally addressed the court, stating: "I would like to go to trial. I've been waiting on a trial date. I've had numerous ... trial dates set. I haven't yet been to trial...."

By September 29, 1995, it was obvious that further delay would occur because neither counsel for Mr. Ford nor Mr. Cullison could be ready by the October trial date; nor by the date of November 13, 1995, which the trial court suggested. At the court's request, counsel for Mr. Hartridge voiced the prejudice he believed Mr. Hartridge would suffer in the event of further delay. The trial court was unpersuaded that delay would prejudice Mr. Hartridge, and announced a new trial date of January 29, 1996, but backed off of that date somewhat when counsel for Mr. Ford expressed uncertainty about his ability to be ready by that date. On January 25, 1996, the trial court confirmed that the trial could not commence on January 29,

10. All counsel and the trial judge met on May 31, 1995, a day set for a hearing on motions. The prosecutor informed the judge that although all motions were required to be filed by May 12th, he did not receive motions in behalf of Mr. Hartridge until May 15th or 16th. Counsel for Mr. Hartridge had been granted leave to file his motions late. The government asked for a continuance which counsel for Mr. Hartridge opposed. The motions hearing was rescheduled for June 23, 1995.

11. Counsel for Mr. Ford had resigned from his position at the Public Defender Service, and Mr. Cullison wanted new counsel.

1996, both because of the unreadiness of Mr. Ford's counsel, and the probability that the trial judge would not be through with another trial by that time. Counsel for Mr. Hartridge renewed his request for a severance, to permit his trial to go forward on January 29, 1996. The government expressed strong opposition to a continuance, as well as a severance.[12] The trial judge picked a new trial date of March 1, 1996. Proceedings in preparation for trial took place on March 7, 1996, and extended hearings on motions began on March 12 and did not end until June 7; jury selection began three days later.

 It is axiomatic that " 'the right to a speedy trial is a fundamental constitutional right.' " *Hammond v. United States*, 880 A.2d 1066, 1079 (D.C.2005) (quoting *Cates v. United States*, 379 A.2d 968, 970 (D.C.1977)) (footnote omitted). This court's approach to a speedy trial claim was delineated in its en banc decision in *Graves v. United States*, 490 A.2d 1086 (D.C.1984). We generally follow the "framework ... established by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)." *Id.* at 1090. *Barker* "identified four factors which are to be examined: the '[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.' " *Graves*, 490 A.2d at 1090–91 (quoting *Barker*, 407 U.S. at 530, 92 S.Ct. 2182). The *Barker* "factors are related and must be considered together with other relevant circumstances in 'a difficult and sensitive balancing process.' " *Graves* at 1091 (quoting *Barker*, 407 U.S. at 533, 92 S.Ct. 2182). Moreover, "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." *Barker*, 407 U.S. at 522, 92 S.Ct. 2182. In that regard, " '[t]he right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice.' " *Id.* (quoting *Beavers v. Haubert*, 198 U.S. 77, 87, 25 S.Ct. 573, 49 L.Ed. 950 (1905)). In reviewing the trial court's findings and conclusions, "we are bound by its findings of fact unless they are plainly wrong or without evidence to support them," but "[w]e may reverse ... for errors of law." *Graves, supra*, 490 A.2d at 1091 (citing D.C.Code § 17–305(a) (1981)) (other citations omitted).

### Length of Delay

 "Delay is measured from the time the individual is formally accused," or arrested. *Graves*, 490 A.2d at 1091 (citations omitted). Mr. Hartridge was arrested on December 3, 1993, for the murder of Mr. Wynn. Hearings on defense motions began on March 12, 1996, and continued largely uninterrupted until June 7, after which jury selection began and continued, with occasional breaks, until July 3. Trial began on July 9. Thus, correctly treating the start of the motions hearings as the commencement of trial, Mr. Hartridge asserts that there was a delay of approximately a week more than 27 months be-

---

**12.** The prosecutor asserted that "a severance ... will endanger the lives of witnesses who have to testify twice and will force taxpayers to pay for two trials." The government would be "forced to call the same witnesses at two trials ... [and] to pick two juries." Government counsel pointed to the District's "bleak financial state," and commented that "taxpayers [would be asked] to waste money on two trials when these [defendants] are legally joined to be tried together." The prosecutor also emphasized that "[i]t would be next to impossible especially in this case to get people to come [to court] twice [to testify]" because of "constant fear of reprisal." He noted that "[w]itnesses in this case ... have already requested protection."

tween his arrest and the start of trial. We regard a delay of "a year or more" to be prima facie evidence of a speedy trial violation, which creates a presumption of prejudice to the defendant. *See Hammond, supra,* 880 A.2d at 1079 (citing *Tribble v. United States,* 447 A.2d 766, 768 (D.C. 1982)) (other citation omitted); *Moore v. United States,* 675 A.2d 71, 74 (D.C.1996). "[T]he government's burden in arguing that no violation has occurred increases in proportion to the length of the delay." *Graves, supra,* 490 A.2d at 1091 (citations omitted). "However, the more serious and complex the charge, the greater is .the delay that will be tolerated." *Id.* (citations omitted). We noted in *Graves* that "[w]hile the 25–month delay [there] was substantial, ... delays of roughly that length and longer have been countenanced by this court when all factors were considered." *Id.* at 1091 & n. 7. Indeed, in *Cates, supra,* the delay was 59 months, in *Hammond,. supra,* 54 months, and in *Jones v. United States,* 483 A.2d 1149 (D.C.1984), 34 months; we affirmed the convictions in those cases for different reasons.

### Reasons for the Delay

In examining and weighing the reasons for delay, we have focused on " 'a deliberate attempt to delay the trial,' " " 'a more neutral reason such as negligence or overcrowded courts,' " " 'a valid reason, such as a missing witness,' " *Graves, supra,* 490 A.2d at 1092 (quoting *Barker, supra,* 407 U.S. at 531, 92 S.Ct. 2182), and " 'significant' delay for government actions deemed less culpable than deliberate foot-dragging to gain tactical advantage but more culpable than the neutral category exemplified by failure to advance trial dates due to court congestion," *id.* (citations omitted). We have on occasion divided the neutral delay category into " 'neutral plus' or 'neutral minus' to indicate that the delay is being weighed more or less heavily against the government." *Hammond, supra,* 880 A.2d at 1080 (citing *Graves, supra,* 490 A.2d at 1097–98 n. 12). For example, "delay occasioned by institutional difficulties of scheduling a block of time when the prosecutor and all counsel could be available has been designated 'neutral minus.' " *Id.* (citing *Graves,* 490 A.2d at 1093).

In applying these standards to the case before us, we note at the outset that an August 22, 1994 trial date was set initially for Mr. Hartridge. Had the trial actually occurred on this date, any allegation of a speedy trial violation undoubtedly would have been rejected. Mr. Hartridge and the government agree that the first period of delay occurred between August 22, 1994 and November 14/15, 1994, a period of 84–85 days. Although Mr. Hartridge objected to Mr. Ford's and Mr. Cullison's July 19, 1994 request for a continuance, and Mr. Ford's motion on November 15 for an additional continuance of 30 days, in his brief he "concedes" that the continuance between August 22, 1994, and November 14, 1994, "*in and of itself,*" would not constitute a violation of his right to a speedy trial." Although Mr. Hartridge does not regard this initial period of delay as a violation of his right to a speedy trial, he nevertheless maintains that "the cumulative effect" of the total delay must be considered.

As Mr. Hartridge notes in his brief, the trial court conducted certain motions hearings between November 15, 1994 and December 13, 1994, and this period "was not technically a continuance of the trial."[13]

---

13. The government characterizes the time between November 15, 1994 and December 1, 1995 as a "2–week delay to permit the government to produce ... witnesses" in accordance with *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Mr.

The second period of delay on which he focuses is the 118–day period between December 13, 1994 and April 10, 1995, and the period between April 10, 1995 and May 31, 1995.[14] During this period, the case was transferred to a new trial judge in January 1995, and the assigned prosecutor also announced his resignation in January. In addition, counsel for Mr. Ford was on scheduled leave from January 15 to March 15, 1995, and contended that he would not be ready for trial until May 1995. Mr. Hartridge acquiesced in the delay, until May 31, 1995. Despite Mr. Hartridge's acquiescence only until May 31, the period between December 13 and April 10 reflects "neutral minus" delay, because of "institutional difficulties of scheduling a block of time when the prosecutor and all counsel could be available." *Hammond, supra,* 880 A.2d at 1080.

Mr. Hartridge and the government differ in their characterization of the delay between May 31, 1995, and March 12, 1996. Mr. Hartridge insists that "the combined delays from 5–31–95 until 3–4–96, a period of 288 days, over nine months, *should* count heavily against the government" (emphasis in original). He asserts that he objected to these delays, and that the delay continued only because of "the government's insistence on keeping the three codefendants joined *directly*" (emphasis in original). He emphasizes that the government told the trial court on two occasions that it "was willing to take its

chances on appeal and that it believed there would be no problem with Appellant's speedy trial rights if Appellant were kept joined to the codefendants who were requesting continuances." Relying on cases outside this jurisdiction, with one exception,[15] Mr. Hartridge declares that "the weight of authority appears to support Appellant's position that a defendant's constitutional right to a speedy trial 'trumps' any interests in judicial efficiency occasioned by necessary delays in bringing a codefendant to trial, at least where the defendant actively seeks a speedy trial through a motion to sever." Yet, he cites only six cases in support of his "weight of authority" assertion.

Under the circumstances of this case, we conclude that Mr. Hartridge's insistence on severance of his case to safeguard his right to a speedy trial, may not "trump" the government's efforts to try the legally joined defendants together, especially in light of the prosecutor's representations, which the trial court did not discount, that his witnesses had already requested protection and would be extremely reluctant to testify twice. See note 12, *supra.* The trial court broached the issue of severance with counsel for Mr. Hartridge on June 23, 1995, when Mr. Hartridge reminded him of his pending motion for dismissal of the indictment on speedy trial grounds, or in the alternative, for severance. The trial judge asked whether he was "sure [his]

Hartridge maintains that even though he "joined in the request for the production of the *Brady* material, he expressly did not want the trial continued," and that the government only made the disclosures in response to a court order. The government concedes that this brief period of time is attributable to it as "significant delay" because of the trial court's ruling.

14. The government begins this period with December 1, 1994 and continues it to April 10, 1995. Both Mr. Hartridge and the gov-

ernment separate out the time between April 10 and May 31, 1995.

15. Mr. Hartridge cites *Townsend v. United States,* 512 A.2d 994 (D.C.1986), but that case is distinguishable since, unlike here, it involved the government's efforts to perfect an indictment against a codefendant. Even so, this court concluded that that period of delay did not weigh "heavily" against the government.

severance motion ha[d] significant merit." Counsel candidly admitted that he "was requesting a severance not because of independent basis for a severance ..., but ... so that [his] client, who had objected to the continuances, could go forward ahead." Counsel did not argue that there were grounds for a severance motion under either Super. Ct.Crim. R. 8(a) (joinder of offenses) and (b) (joinder of defendants), or Rule 14 (prejudicial joinder), only that the severance motion was a way of proceeding with an earlier trial date for his client.

▬ Balanced against Mr. Hartridge's efforts to advance his client's constitutional interest in a speedy trial is the government's desire for joinder of all defendants in the same proceeding. "[J]oinder of cases is favored, where appropriate, because it fosters efficient use of judicial and prosecutorial resources and decreases the burden on citizens who are called as witnesses." *Adams v. United States,* 466 A.2d 439, 445 (D.C.1983) (citing *Ready v. United States,* 445 A.2d 982, 985 (D.C. 1982), *cert. denied,* 460 U.S. 1025, 103 S.Ct. 1279, 75 L.Ed.2d 498 (1983)). Where the government espouses a policy of trying defendants jointly, our cases assign "some responsibility," *Ruffin v. United States,* 524 A.2d 685, 688 (D.C.1987), to the government for the delay in a defendant's trial, but "in light of the policy considerations favoring joinder, this responsibility does not weigh heavily against the government." *Id.* at 689 (citing *Adams, supra,* 466 A.2d at 444–45). Even in *Townsend, supra,* where the government delay was traceable to its endeavor "to build a case [against a potential defendant] so that all three defendants could be tried jointly," and we said that "the proffered reason does not excuse the delay or render it neutral," we declared that the delay "does not weigh heavily against the government,

as it was not intended to gain a strategic advantage as such over [the appellant], but rather was apparently intended to realize the generally recognized benefits that attend joint trials." 512 A.2d at 999. While the government expressed opposition to some of the continuances in this case, it steadfastly advocated a policy of joint trials. Delay alone does not point to a speedy trial violation because the right to a speedy trial "is consistent with delays and depends on circumstances." *Barker, supra,* 407 U.S. at 522, 92 S.Ct. 2182. Whether a point was reached in this case where that policy of a joint trial should have yielded to Mr. Hartridge's constitutional right to a speedy trial depends, we believe, upon the strength of Mr. Hartridge's assertion of his right to a speedy trial and the prejudice to him traceable to the delay in his trial.

### Mr. Hartridge's Assertion of His Right to a Speedy Trial

Mr. Hartridge made an oral demand for a speedy trial during his arraignment on April 12, 1994, but he did not make a written demand until more than one year later, on May 15, 1995, and some seventeen months after his detention. Although the question of Mr. Hartridge's speedy trial right was raised at other times and there is little doubt that Mr. Hartridge opposed delay in his trial, the record shows that on two occasions, October 6, 1994 and September 12, 1995, the respective trial judges rather than counsel for Mr. Hartridge uttered the words, "speedy trial." And, on at least one occasion, January 27, 1995, Mr. Hartridge did not oppose a continuance requested by counsel for Mr. Ford. Thus, it is not altogether accurate to say, as does Mr. Hartridge, that he "continuously" demanded a speedy trial. We have said previously that "the assertion of the right must be considered in light of its 'frequency and force.'" *Hammond, su-*

*pra,* 880 A.2d at 1086 (citing *Dickerson v. United States,* 650 A.2d 680, 685 (D.C. 1994)). Here, the weight to be given Mr. Hartridge's assertion of his right to a speedy trial is diminished by his delay in a written assertion, the lack of "a direct assertion of the right," *Dickerson, supra,* 650 A.2d at 685 (citations omitted) during at least two status conferences, and his decision not to object to a continuance in January 1995, *see Hammond, supra,* 880 A.2d at 1086.

### Prejudice to Mr. Hartridge

Relying on prejudice factors identified in *Barker, supra,* 407 U.S. at 532, 92 S.Ct. 2182, Mr. Hartridge argues that he was prejudiced by his pre-trial incarceration of "2 years, 3 months and 9 days." During this period he experienced "anxiety and concern," as evidenced by his brutal beating by correctional officials and "permanent scarring to his back and hands." In addition, he "was falsely accused of attacking several corrections officers and was held in solitary confinement ... or at the isolation cellblock at the [D.C.] jail" for a substantial period of time before trial.[16] He claims that his defense was hindered or impaired because "studies ... have shown that defendants held without bond have a lesser chance of prevailing at trial," and that "the government use[d] ... the time gained from all of the continuances ... to develop and improve its case." The government emphasizes that the trial court denied Mr. Hartridge's post-trial motion relating to his speedy trial contention, in part because Mr. Hartridge did not "suffer 'specific prejudice by way of loss of witnesses.'"

Mr. Hartridge was subjected to a long period of pre-trial incarceration, but "[t]he passage of time alone ... is not disposi-

tive," *Lemon v. United States,* 564 A.2d 1368, 1377 (D.C.1989) (citation omitted), and "greater ... delay ... will be tolerated" in cases involving "more serious and complex ... charge[s]," here a charge of first-degree murder while armed (premeditated). *Id.* (citing *Graves, supra,* 490 A.2d at 1091). With respect to the anxiety and concern Mr. Hartridge allegedly suffered from an assault at the D.C. jail, as the government points out, "[a] grand jury found probable cause to believe that he had assaulted guards at the jail." He was tried on felony charges for the assault, acquitted on some and the jury deadlocked on others. Although Mr. Hartridge may have suffered some anxiety and concern as a result of his alleged beating and permanent scarring, we have said previously that an "appellant's other contact with the criminal justice system ... lessens any anxiety ... pending charges caused him." *Turner v. United States,* 622 A.2d 667, 679 (D.C.1993). Mr. Hartridge had several juvenile delinquency adjudications, and had two pending misdemeanor cases when he was arrested. Moreover, as in *Turner,* Mr. Hartridge "makes no attempt to allege any particularized harm—psychological, economic, or other—to his family relationships, mental well-being, job prospects, or any other aspect of his life." *Id.* (footnote omitted). *See also Hammond, supra,* 880 A.2d at 1087 (an appellant "must show that 'the alleged anxiety and concern had a specific impact on [his] health or personal or business affairs'") (citation omitted).

Most telling, however concerning the prejudice prong, Mr. Hartridge's argument relating to the impairment of his defense lacks specificity. He had witnesses present at trial but chose not to present them; nor did he identify any

---

16. He stated that he "was *acquitted* of all but a handful of charges, which the government subsequently dismissed with prejudice after it

was discovered the jury had deadlocked heavily in favor of acquittal" (emphasis in original).

potential witness whom he may have lost because of the delay in his trial. "The absence of this most serious form of prejudice weighs heavily in our determination of whether appellant was deprived of his right [to a speedy trial]." *Turner, supra,* 622 A.2d at 679 (citing *Graves, supra,* 490 A.2d at 1103 (other citations omitted)). Any improvement in the government's case during the period of delay would not establish an impairment of Mr. Hartridge's defense. *See Barker,* 407 U.S. at 516–18, 92 S.Ct. 2182.

Our dissenting colleague concedes, as he must, that possible impairment of the accused's defense is "the most serious [form of prejudice]" the speedy trial right protects against, "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker, supra,* 407 U.S. at 532, 92 S.Ct. 2182. But he largely discounts the absence here of any showing of prejudice of this kind by relying on *Doggett v. United States,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), a case in which "egregious persistence [by the government] in failing to prosecute the defendant" led to a delay of nearly 8½ years between his indictment and trial—a delay "six times as long as that generally sufficient to trigger judicial review" of a speedy trial claim. *Id.* at 657–58, 112 S.Ct. 2686. Key to the court's analysis in *Doggett* was the government's "inexcusable oversights" in attempting to track down and arrest the accused, *id.* at 657, 112 S.Ct. 2686, for as the Court pointed out, "if the Government

had pursued Doggett with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail . . . as a matter of course *however great the delay, so long as Doggett could not show specific prejudice to his defense." Id.* at 656, 112 S.Ct. 2686 (emphasis added).

In this case, no comparable degree of fault can be assigned to the government in failing to bring Mr. Hartridge to trial earlier. Mr. Hartridge was charged with committing a murder not by himself but with the aid of confederates, and in such circumstances, as this case aptly demonstrates, the difficulty a trial court has in attempting to schedule a reasonably timely date of trial when all of multiple defense counsel are available can be severe. Nor is that difficulty met by easy recourse to severance of defendants, for that disregards society's important interest in having persons charged with jointly committing grave offenses tried together. *See Ruffin, supra,* 524 A.2d at 688. On the other side of the balance, of course, is that Mr. Hartridge—unlike the accused in *Doggett*—was incarcerated before trial. But while we do not minimize the anxiety and disruption to his life that Mr. Hartridge endured while detained, *Doggett* nevertheless implies—consistent with *Barker* and our own decisions—that absent either serious fault by the government in causing the lapse of time *or* specific prejudice to preparation of the defense, the delay of twenty-eight months in bringing Mr. Hartridge to trial does not justify the severe remedy of dismissal.[17]

---

**17.** Furthermore, we respectfully disagree with our dissenting colleague's assertion "that the opinion of the majority stretches [the *Barker* balancing test] to the breaking point in rejecting appellant Hartridge's speedy trial claim." *Barker* recognized "the difficulty of the task of balancing [the] factors" set forth in that case. *Id.* at 534, 92 S.Ct. 2182. Indeed, the majority considered *Barker* itself "to be [a] close

[case]," *id.,* despite the fact that "[i]t was clear that the length of delay between arrest and trial—well over five years—was extraordinary." *Id.* In discussing its conclusion that Mr. Barker "was not deprived of his due process right to a speedy trial," *id.* at 536, 92 S.Ct. 2182, the Supreme Court focused on two "counterbalancing factors"—"the absence of serious prejudice" and "the fact that

In sum, while there was substantial delay in Mr. Hartridge's trial, our review of all of the factors used to determine whether there was a violation of his right to a speedy trial convinces us, in this serious first-degree murder (premeditated) while armed case, that no violation occurred. Significantly, Mr. Hartridge's argument regarding prejudice is simply unpersuasive on this record.

### The "Other Crimes" Issue

 All of the appellants claim that the trial court improperly allowed the introduction of "other crimes" evidence against them. Specifically, they point to evidence relating to the November 22, 1993 murder of Robert Wilkins, and the robbery of Datwon Paris shortly before the murder of Mr. Wynn. They mainly contend that the evidence was not relevant, that its probative value was outweighed by its substantial prejudice to them, and that the trial court did not conduct a proper "other crimes" analysis prior to admitting the evidence. The government maintains that the trial court extensively reviewed the evidence and sanitized it. Moreover, the government asserts, the sanitized evidence was not "other crimes evidence"; it was relevant, and its probative value was not substantially outweighed by its prejudice.

The record shows that prior to the commencement of trial, the trial court conducted an extensive review of the government's notices of intent to introduce evidence of other crimes (including the murder of Ronald Wilkins), prior gun possession (during an encounter with Datwon Paris), and subsequent gun possession (during November and early December 1993). Counsel for the appellants, the prosecutor and the trial court engaged in detailed discussion and painstaking examination of proffered testimony regarding the government's notices, including the relevancy of the testimony, its probative value and its potential for undue prejudice.

Initially, the government wanted to show that shortly before Mr. Wynn's mur-

---

Barker did not want a speedy trial." *Id.* at 534, 92 S.Ct. 2182. By concentrating so heavily upon the time during which Mr. Hartridge was incarcerated prior to trial (two years, three months and nine days according to Mr. Hartridge), our dissenting colleague loses sight of *Barker*'s more comprehensive approach to the prejudice factor. In that regard, *Barker* declared that:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system . . .

*Id.* at 532, 92 S.Ct. 2182 (footnote omitted). The *Barker* court acknowledged that "Barker was prejudiced to some extent by living for over four years under a cloud of suspicion and anxiety," even though he actually spent only "10 months in jail before trial." *Id.* Despite the impact of the delay on Mr. Barker's liberty interest, however, the Supreme Court emphasized that "there is no claim that any of Barker's witnesses died or otherwise became unavailable owing to the delay." *Id.* Similarly, our cases examine all three of the components of the prejudice prong, rather than highlighting only a defendant's incarceration prior to trial. *See United States v. Stephenson*, 891 A.2d 1076, 1083 (D.C.2006); *District of Columbia v. Cruz*, 828 A.2d 181, 183 (D.C.2003); *Akins v. United States*, 679 A.2d 1017, 1024 (D.C.1996). In short, contrary to the approach of our dissenting colleague, a faithful balancing of the *Barker* prejudice factor requires consideration of all three components of that factor, and more than a passing recognition that the third component, "the possibility of impairment of the defense, [is] the most important." *Stephenson, supra*, at 1083. As we have explained, Mr. Hartridge's speedy trial argument falls short because it misses the mark with respect to the second and third components of the prejudice factor.

der, Mr. Hartridge had "smashed a window" in an automobile belonging to Mr. Paris, and that Mr. Paris had been the victim of an armed robbery at the hands of the appellants who believed that Mr. Paris was responsible for the arrest of Shannon Battle. The testimony also would have established that both Mr. Ford and Mr. Cullison had guns "and pointed them at [Mr.] Paris"; and that Mr. Hartridge removed keys and money from Mr. Paris. The trial court only permitted Mr. Paris to state that he saw guns in the hands of Mr. Ford and Mr. Cullison, but not that they were pointed at Mr. Paris. The government agreed not to present any testimony regarding the alleged robbery or the smashing of the car. Thus, "other crimes" evidence was not to be admitted, but the court considered that the sanitized testimony relating to gun possession before and after the murder of Mr. Wynn, would be admitted because it was relevant and probative, but not unduly prejudicial. The court stated that the sanitized version demonstrated that Mr. Paris would remember the incident due to the presence of guns, and further, it established a nexus between the guns and Mr. Wynn's murder. In addition, under the sanitized version, the jury did not hear anything about armed robbery, destruction of property, or pointing the gun at Mr. Paris.

The government also initially planned to present evidence revealing that two weeks after the murder of Mr. Wynn, the appellants all were present when Mr. Wilkins was murdered in the 2100 block of I Street, in the Northeast quadrant of the District, and that the same Glock 9–millimeter gun which Mr. Ford allegedly used to kill Mr. Wynn also was fired in the shooting death of Mr. Wilkins. In addition, a .38 caliber pistol was fired in the murder of both men. The evidence would have shown that the motive for the murder of Mr. Wilkins was that "he was suspected of

having 'snitched' on [Mr.] Ford." At trial, Paula Mayo, a resident of the 2100 block of I Street, N.E. at the time of Mr. Wilkins' murder, testified that she was sitting on a friend's porch in the same neighborhood when she heard shots. She saw Mr. Ford and Mr. Hartridge, as well as two other men, one by the name of Marcus [Brooks]. On cross-examination, Ms. Mayo acknowledged that she did not see either Mr. Ford or Mr. Hartridge with a gun, and that she was not present when Mr. Wynn was shot. On redirect examination, Ms. Mayo saw "a gun in somebody's hand, but [she did not] know who that person was," but that that person entered the block with Mr. Ford and Mr. Hartridge. Detective Jeffrey A. Mayberry of the Metropolitan Police Department ("MPD") stated at trial that he showed a photo array to Ms. Mayo on June 8, 1994, and that she picked out the photograph of Mr. Cullison, saying "this is probably the guy [who was with Messers Ford, Hartridge and Brooks]. He had a bush."

In addition to Ms. Mayo, Monique Lee was sitting outside in the 2100 block of I Street, with her brother and other friends, including Paula Mayo and Nikki. She saw Mr. Ford, Mr. Hartridge and Mr. Brooks come into the block. She testified that they were "the only three [she saw] together." She was impeached with her grand jury testimony which indicated that she also saw two other "boys." Ms. Lee continued to contradict her grand jury testimony as the prosecutor focused on the other two persons, the gunshots that were fired, and photographs that Ms. Lee had been shown by an MPD officer in an effort to identify the other two persons.

During the investigation of the murder of Mr. Wilkins, Sergeant Daniel Wagner of the MPD questioned Ms. Lee and showed a photo array to her. He testified that Ms. Lee had been in "Mr. Cullison's pres-

ence on November 22, 1993," for "several minutes." She was "within 20 or 30 feet" of him, and had seen him "[a] couple of times" prior to that day. Upon seeing Mr. Cullison's photo in the photo array, Ms. Lee said: "It might be him that was with Mark [Ford] and them." At trial, Ms. Lee remembered that Sergeant Wagner had shown her a photo array, but said she did not recall what she had said when she "looked at the man's picture." She was impeached with her grand jury testimony. There she was asked about the photo array Sergeant Wagner showed her; the prosecutor inquired: "Now, when you looked at the first stack of photographs you came to a photograph of a boy and you said, I've seen him. It might be him that was with Mark and 'nem. I'm not sure if he was, but he might have been." Ms. Lee then responded, "Yes." At trial, Ms. Lee said she did not recall that answer but that she remembered "saying that I don't know him, but I seen him before." However, she maintained that she saw the "two boys . . . alone" and didn't know who they were with.

Ballistics evidence was introduced by the government through the testimony of MPD Officer Rex Plant of the Mobile Crime Lab, Karen Wiggins, a civilian MPD employee assigned to Firearm Identification Unit, and Walter Dandridge of MPD's Fire Arms Section of the Criminal Investigation Division. A 9–millimeter semi-automatic Glock pistol was seized by the police about five weeks after Mr. Wynn was murdered. It was found on the person of Shannon Battle who was in a car driven by Mr. Cullison. A .38–caliber handgun, also fired during the murder of Mr. Wynn and again on I Street, was taken from Mr. Hartridge's mother's foster son in March 1994. The 9–millimeter Glock had been used in the murder of Mr. Wynn and also had been fired two weeks later on I Street. Officer Plant collected evidence from the

crime scene on November 22, 1993, the day of Mr. Wilkins' murder. He identified nine millimeter expended shell casings, as well as lead and copper fragments and a lead bullet collected from the I Street crime scene. Ms. Wiggins examined the evidence recovered from the I Street crime scene, and the 9–millimeter and .38–caliber guns and determined, that "each one of the cartridge cases" . . . fired in [the 9–millimeter gun], and the "9[-]millimeter Lugar copper jacketed bullet" "were compatible with being fired from a firearm manufactured by Glock." She also found "an area of similarity" between "the test fire from the [.]38–caliber gun" and "the [.]38[-]caliber lead bullets." Officer Dandridge examined and compared the cartridge cases. He "concluded that they were fired from the same firearm . . .[,] a pistol similar to the Glock[, that is,] manufactured by Glock, Glock style." And, he determined that the .38–caliber bullets were fired from the revolver introduced at trial.

 " 'It is a principle of long standing in our law that evidence of one crime is inadmissible to prove disposition to commit crime, from which the jury may infer that the defendant committed the crime charged.' " *Jackson v. United States*, 856 A.2d 1111, 1114 (D.C.2004); *see also Johnson v. United States*, 683 A.2d 1087, 1092 (D.C.1996) (en banc) (quoting *Drew v. United States*, 118 U.S.App. D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964)). The general prohibition on the introduction of "other crimes" *Drew* evidence "is intended to protect a criminal defendant from undue prejudice, *i.e.*, that the jury will infer that the accused committed the crime charged because of his or her commission of an uncharged crime." *Hammond, supra,* 880 A.2d at 1093 (citing *Drew, supra,* 118 U.S.App. D.C. at 15–16, 331 F.2d at 89–90). *Drew* evidence is presumptively prejudicial, but the presumption "may be over-

come if [it] ... [is] offered for a substantial, legitimate purpose, ... and the court [] considers the relative probative value of the evidence and the danger of unfair prejudice that it poses, and concludes that the balance favors admission." *Jackson, supra,* 856 A.2d at 1115 (citing *Johnson, supra,* 683 A.2d at 1092–93 (footnote and internal quotation marks omitted)). We also said in *Johnson, supra,* that "the inadmissibility of ... evidence of other crimes may be overcome if it is offered on and determined to be relevant to a material issue in the case." 683 A.2d at 1090. And, "*Drew* does not apply at all where such evidence (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." *Jackson, supra,* 856 A.2d at 1115 (citing *Johnson, supra,* 683 A.2d at 1098) (internal quotation marks omitted).

 "The one requirement that applies to the admission of all evidence of other crimes, *Drew* and non-*Drew* alike, is that relevance, or probative value, must be weighed against the danger of unfair prejudice." *Busey v. United States,* 747 A.2d 1153, 1165 (D.C.2000) (internal quotation marks omitted). "The 'test for relevance is not a particularly stringent one.'" *Id.* (quoting *Street v. United States,* 602 A.2d 141, 143 (D.C.1992)) (other citation omitted). "Relevant evidence is simply 'that which tends to make the existence or non-existence of a [contested] fact more or less probable' than it would be without the evidence." *Id.* (quoting *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977)

(other citation omitted)); *see also Freeman v. United States,* 689 A.2d 575, 580 (D.C.1997). Moreover, "[t]he trial court's determination of the relevance of prior evidence of bad acts is reviewed for an abuse of discretion." *Frye v. United States,* Nos. 02–CF–1233, 03–CO–430, and 03–CO–1492 (D.C. October 14, 2005), 2005 WL 2665432, at *3, 2005 D.C.App. LEXIS 532, at *11 (citations omitted). "Even if otherwise meeting the test for admissibility as an exception to *Drew,* the evidence must still be excluded if the danger of unfair prejudice [resulting from its admission] substantially outweighs its probative value." *Id.* (citing *Johnson, supra,* 683 A.2d at 1101) (internal quotation marks omitted). Furthermore, "'we recognize that the evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision.'" *Mercer v. United States,* 724 A.2d 1176, 1185 (D.C.1999) (quoting *Johnson, supra,* 683 A.2d at 1095).

Here, the trial court did not allow the government to introduce evidence establishing an armed robbery of Mr. Paris, or the murder of Mr. Wilkins; hence, the evidence admitted was not typically *Drew.*[18] The trial court carefully scaled back the evidence that the government initially wanted to present so that the jury learned only from Mr. Paris that Mr. Hartridge started "acting wild" following Mr. Battle's arrest on November 8, 1993, that all three appellants stood in close proximity to Mr. Paris, and that Mr. Paris saw both Mr. Ford and Mr. Cullison with guns.

---

18. Despite the sanitized and whittled down evidence that the trial court admitted, appellants largely base their other crimes argument on the robbery of Mr. Paris and the murder of Mr. Wilkins, as though that evidence had been admitted at trial. For example, Mr. Cullison says in his reply brief: "The armed

robbery of Paris and the murder of Wilkins were simply irrelevant to the killing of Mr. Wynn." We are unpersuaded by this and other arguments leveled by the appellants with respect to the sanitized and whittled down evidence pertaining to the day of the Paris robbery and the day of the Wilkins' murder.

The jury also heard a reluctant Ms. Mayo say that on November 22, 1993, she saw Mr. Ford and Mr. Hartridge and "probably" Mr. Cullison, in the I Street area, that she heard shots, and that she noticed a gun in someone's hands but did not know who had the gun. Although Ms. Lee recanted her grand jury testimony, Sergeant Wagner informed the jury at appellants' trial of her statement, that she had seen Mr. Cullison and that he "might" have been with Mr. Ford and others.

■ This sanitized or whittled down evidence focusing on the presence of the appellants and their access to guns prior to the murder of Mr. Wynn, and at the time of the murder of Mr. Wilkins, and Mr. Hartridge's reaction to Mr. Battle's arrest, was not typically *Drew* evidence. Hence it did not require a *Drew* analysis.[19] Nevertheless, the sanitized and whittled down version had to be relevant or probative, and its prejudicial impact had to be weighed. We conclude that the sanitized and whittled down evidence introduced at trial had at least minimal relevance or probative value with respect to a material issue, *Johnson, supra,* 683 A.2d at 1090; *Busey, supra,* 747 A.2d at 1165, that is, the appellants' access to guns and their possession of guns which could be or were used to shoot Mr. Wynn. Without any citation to case law, Mr. Cullison says in his Reply Brief: "[E]ven if the same guns were used, under the case law in this jurisdiction, *there has to be more.*" But, with respect to evidence showing that appellants' had prior possession of a gun

(such as the testimony elicited from Ms. Givens and Mr. Paris), "[w]e have held that 'an accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible.'" *McConnaughey v. United States,* 804 A.2d 334, 339 (D.C.2002) (quoting *Coleman v. United States,* 379 A.2d 710, 712 (D.C. 1977)). Given the ballistics' testimony, the evidence regarding the guns also served as direct and substantial proof of the crime of murder (of Mr. Wynn), and Mr. Paris' testimony about Mr. Battle and Mr. Hartridge's reaction helped to explain the murder of Mr. Wynn and the connection to the arrest of Mr. Battle. *See Jackson, supra,* 856 A.2d at 1115 & n. 4 (citing *Johnson, supra,* 683 A.2d at 1098 and 1092).

Even though the challenged evidence had at least minimal relevance, or probative value, a question remains as to whether it should have been excluded, as appellants argue, on the ground that "the danger of unfair prejudice substantially outweigh[ed] its probative value." *Johnson, supra,* 683 A.2d at 1099. Ballistics evidence presented through government witnesses established a connection (compatibility of spent 9 millimeter Lugar copper jacketed bullets with firing from a 9-millimeter Glock and "an area of similarity" between "the test fire" from the .38 caliber-gun and "the [.]38 caliber bullets") between the guns used in the murders of Mr. Wynn and Mr. Wilkins, and testimony from the government's fact witnesses re-

---

**19.** We are not persuaded that Mr. Paris' statement that appellants "asked me what I had in my pocket," or Lisa Prager's assertion that she encountered Ms. Givens during "an investigation that included several murders that occurred," constitute typical *Drew* evidence. At any rate, the trial court instructed the jury "to ignore [Mr. Paris' statement] and give it absolutely no weight or no consideration at the end of this case in your deliberations," and with respect to Ms. Prager's assertion, that "the witness' reference to the investigation [of] other homicides had nothing to do with this case." Jurors are presumed to follow the trial court's instructions. *See Parker v. United States,* 797 A.2d 1245, 1251 (D.C. 2002).

vealed that (1) Ms. Givens saw Mr. Hartridge with a gun "in [her] mother's house two days before" the murder of Mr. Wynn, heard gunshots at the time of his murder, saw Mr. Hartridge and Mr. Cullison standing "[o]ver top of Mr. Wynn," and watched them "unloading the gun" while Mr. Ford stood nearby; (2) Mr. Shannon heard Mr. Hartridge say to another man "to bust [Mr. Wynn], kill his a**," saw Mr. Ford shoot Mr. Wynn, and testified that the 9–millimeter gun shown to him at trial "looked just like" the one used to shoot Mr. Wynn; (3) Mr. Proctor witnessed the confrontation of Mr. Paris by Mr. Hartridge, observed Mr. Cullison with "a small handgun, black," noticed all of the appellants with Mr. Wynn, heard gunshots and saw Mr. Ford "shooting the gun, shooting Mr. Wynn;" (4) Mr. Paris "saw a gun" in Mr. Ford's hands, and "[a] gun ... [a] .38" in Mr. Cullison's hands on November 8, 1993; (5) On November 22, 1993, Ms. Mayo saw a gun in the hand of a person who was with Mr. Ford and Mr. Hartridge and thought that Mr. Cullison "probably" entered the 2100 block of I Street with them; and (6) Sergeant Wagner testified that Ms. Lee stated that Mr. Cullison "might" have been with Mr. Ford and others on November 22, 1993.

Because this evidence established at least a reasonable probability the appel-

lants either were seen with, or had reasonable access to, guns probably used in the murders of Mr. Wynn and Mr. Wilkins on November 8 and 22, 1993,[20] and helped to explain the murder of Mr. Wynn, but did not show any armed robbery of Mr. Paris, or establish the murder of Mr. Wilkins, we cannot say that the trial court abused its discretion in concluding that the danger of unfair prejudice did not substantially outweigh its probative value.[21] As we said in *McConnaughey, supra:* "It is true that the evidence established only a reasonable probability, and not a certainty, that appellant[s] possessed the murder weapon, but this lack of certainty went only to the weight of the evidence, not its admissibility." 804 A.2d at 339 (citing *Busey, supra,* 747 A.2d at 1153). The trial court in this case carefully scrutinized and whittled down the evidence the government wished to present, in large measure because if its concern that "prejudicial matter does not get injected into the trial." The "balancing of probative value and prejudice is committed to the discretion of the trial judge, and this court will review it only for abuse of that discretion." *Busey, supra,* 747 A.2d at 1165 (citing *Johnson, supra,* 683 A.2d at 1095 (other citation omitted)). On this record, we are satisfied that the trial court used its discretion in conducting the proper balancing, and did not admit testimony showing a propensity to commit

---

20. Under the sanitized and whittled down version of evidence relating to the Wilkins' murder that the government initially wanted to introduce, the question of constructive possession of the guns was not pertinent. Despite the argument of Mr. Hartridge suggesting that constructive possession was an important part of the trial court's ruling, the record shows that the trial court admitted testimony concerning a gun as part of its sanitized and whittled down version of the Wilkins' shooting because it was "relevant on the issue of access and opportunity," but ruled alternatively that the evidence was sufficient to establish constructive possession.

Under the circumstances of this case, we cannot say that the alternative ruling constituted error. *See Rivas v. United States,* 783 A.2d 125, 131 (D.C.2001) (en banc).

21. Contrary to appellants' arguments, the admission of testimony that the appellants were seen together on November 22, 1993, did not fall under the forbidden "guilt by association" doctrine. Rather, that testimony and the ballistics evidence minimally established their connection to the probable murder weapon, and that they were part of a small group that had access to the weapon.

a crime. Furthermore, the testimony admitted was not typical *Drew* evidence but was "directly relevant," *id.*, because it showed a reasonable probability, rather than mere conjecture, that appellants had possession of or access to a weapon used in the killing of Mr. Wynn. *Id.*

### Other Arguments

### Improper Prosecutorial Comments

 We turn now to appellants' other arguments. They contend that the prosecutor made inappropriate remarks in its rebuttal argument, for example, in asking the jurors to "be fair to . . . your fellow members of the District of Columbia," and by showing disrespect of defense counsel. The transcript reveals that as the prosecutor was nearing the end of his rebuttal argument, he articulated a theme around the word "fairness," telling the jurors that they must be fair to themselves, each other and their fellow citizens. The trial judge sustained counsel for Mr. Ford's "[o]bjection to the form of the argument." [22] After reminding the jury that it could not change its mind after the verdict, the prosecutor said, in part: "You can't say you're sorry to yourself; you can't say you're sorry to each other; and you can't say you're sorry to your fellow citizens." Counsel for Mr. Ford again objected. The trial judge sustained the objection and admonished the prosecutor: "The case is supposed to be evaluated on the facts and not on fellow citizens." Earlier in his rebuttal, the prosecutor focused on defense counsel's questioning of the government's witnesses and concluded by stating: "[T]hese witnesses aren't on trial. These witnesses don't need to be treated with such disrespect like they were." The trial judge sustained the objection of counsel

for Mr. Ford. When it appeared that the prosecutor might persist in this line of argument, the judge interrupted him, saying: "Counsel, argue the facts of the case. The jury witnessed how Counsel conducted the proceedings." No defense counsel moved for a mistrial because of the prosecutor's comments relating to "fellow citizens" or to the actions of defense counsel.

 On Monday, September 9, 1996, counsel for appellants raised issues regarding the government's rebuttal. Counsel for Mr. Cullison complained that in response to his closing argument that Ms. Mayo "did not make an in-court identification of Mr. Cullison," the prosecutor "hypothesized or speculated that one of the reasons which [the prosecutor] communicated to the jury is that Mr. Cullison might have or may have been the gunman." Counsel did not request a mistrial or make a motion to strike the prosecutor's statements, but said: "I think that [commenting that Mr. Cullison was the gunman was] contrary to the Court's ruling, so I'm going to object to that, but I'm not going to ask for an instruction to strike that because I don't want to highlight that testimony." In his brief submitted to this court Mr. Cullison argues in essence that the prosecutor stated a fact not in evidence, that the trial court committed plain error in permitting the comment, and that the comment substantially prejudiced Mr. Cullison. The record reveals that the trial court consistently ruled that the gun used on I Street should not be placed in the hands of anyone, but during rebuttal the prosecutor disregarded this precise ruling.

The transcripts show that in closing argument the prosecutor focused, in part, on I Street by referencing the discharge of

---

**22.** The prosecutor took issue with the court's ruling, arguing that his statement was "directly responsive." The judge disagreed, declaring: "The Court of Appeals has said otherwise."

the guns, and then said "And Paula Battles (sic), she didn't want to tell you who the gunman was. All right? She ... was clear as a bell ... that that gunman walked in with Mark Ford and Thaddeuse (sic) Hartridge. And I'll tell you, it was James Cullison." There was no objection by Mr. Cullison's counsel or any of the appellants' counsel. During rebuttal the prosecutor turned to I Street again and Ms. Mayo's identification, stating in part:

> And then when she picked Mr. Cullison out of that photo spread, again, here in court, like she did in June of 1994, she didn't want to identify him. She didn't identify him in court.
>
> I submit to you, ladies and gentleman, she didn't want to identify the gunman.

Again, no objection was made. By indicating to the jury that Ms. Mayo had identified Mr. Cullison as the gunman, despite the fact that the trial judge had ruled on more than one occasion that the gun was not to be placed in anyone's hands, including those of Mr. Cullison, the prosecutor clearly stated a fact not in evidence. The record shows that the trial judge specifically stated that during his questions about I Street, the prosecutor could not ask Ms. Mayo "whether [the gun] was in Mr. Cullison's hand." During her direct testimony and in response to the prosecutor's question as to the persons she saw "walk into the [I Street] block, Ms. Mayo replied," "Marcus [Brooks], Thaddeus [Hartridge] and Mark [Ford]. And I don't know the other person." On redirect examination the following questions and answers were heard by the jury:

> Q Ms. Mayo, can you please tell the ladies and gentlemen of the jury whether or not you saw a gun in anyone's hand when you heard the gunshots?

> A Yes, I[saw] a gun in somebody's hand, but I don't know who that person was.
>
> Q Could you tell the ladies and gentlemen of the jury whether or not the person that you saw with the gun, whether that person walked into the block with Thaddeus Hartridge and Mark Ford?

[Counsel for Mr. Ford]: Objection.

The Witness: Yes, they walked up into the block with them, yes.

The Court: Objection overruled. You may continue to answer.

> Q I'm sorry. Could you repeat your answer please?
>
> A Yes, the gunman, whoever it was, was with Mark and Thaddeus....

Ms. Mayo's identification of Mr. Cullison as a person on the scene was not definite. When she picked out Mr. Cullison's photograph, Detective Mayberry testified that she declared: "[T]his is probably the guy [who was with Messers Ford, Hartridge and Brooks]. He had a bush." On the day following the prosecutor's rebuttal, Mr. Cullison informed the trial judge that he was "not going to ask for an instruction to strike" the prosecutor's comment, the judge inquired: "And you're not moving for a mistrial on the basis of it ...." Counsel for Mr. Cullison answered: "Not at this time."

Counsel for Mr. Ford sought a mistrial because of the prosecutor's reference to the year 1996, and the argument "that a witness in Washington, D.C. in 1996 takes his or her life into his or her hands by coming forward." Counsel also objected to what he recalled as the prosecutor's "rhetorical question: How do you think a witness would feel having to come in and testify in front of men whom they saw kill someone or commit a murder?" Counsel for Mr. Hartridge could not remember "the exact language" used by the prosecu-

tor but that it was "[s]omething like these defendants with two guns or with these guns....[,] which he believed" "contravened the spirit of what the court was permitting in evidence concerning [the I Street] incident." The trial judge denied the requests for a mistrial on the ground that "in many instances counsel's arguments for the prosecution may go to the edge of the envelope but still be considered harmless or not of that degree of magnitude to justify a mistrial ...."

■ Our cases have discussed repeatedly the nature of improper prosecutorial comments in closing arguments and especially in rebuttal, and have said that "comments appealing to the emotions, prejudices and passions of the jury" or "arguing facts not in evidence or misstating facts in evidence," are improper. *Diaz v. United States,* 716 A.2d 173, 180 (D.C. 1998) (citations and internal quotation marks omitted). And, attacks on opposing counsel are improper. *See United States v. Moore,* 322 U.S.App. D.C. 334, 347, 104 F.3d 377, 390 (1997). If the comments are improper, as were the prosecutor's comments in this case with respect to "fellow citizens," the questioning of government witnesses by defense counsel, and the identification of Mr. Cullison as "the gunman" on I Street, we determine whether the comments "rise to the level of substantial prejudice." *Id.* (citations and internal quotation marks omitted). This determination involves an examination of the gravity of the improper comments, the corrective action taken by the trial judge, and the strength of the government's case.

■ We conclude that Mr. Hartridge and Mr. Ford were not substantially prejudiced by the prosecutor's comments of which they complain. In the case of the argument regarding "fellow citizens" and that pertaining to defense counsel, the trial judge immediately admonished govern-

ment counsel, and defense counsel did not request a mistrial. With respect to the other comments, relating to 1996 and the rhetorical question, our review of the transcript satisfies us that the prosecutor's comments were not improper when considered in the context of defense counsel's closing arguments and given the complexity and length of the trial. *See Jackson v. United States,* 623 A.2d 571, 586 (D.C. 1993), *cert denied,* 510 U.S. 1030, 114 S.Ct. 649, 126 L.Ed.2d 607 (1993); *Coleman v. United States,* 515 A.2d 439, 450 (D.C. 1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 205 (1987). Whether the prosecutor's comments placing the gun in Mr. Cullison's hands on I Street substantially prejudiced him, despite counsel's decision not to ask that the comments be struck, or for a mistrial, depends in part upon the sufficiency of the evidence argument also raised by counsel for Mr. Cullison, which we discuss below. *See Freeman v. United States,* 689 A.2d 575, 584 (D.C.1997) (factors to be considered in determining the existence of substantial prejudice are "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error").

**Sufficiency of the Evidence and the Identification Procedure as to Mr. Cullison**

■ Mr. Cullison argues that the trial court erred by not granting his motion for judgment of acquittal, because there was "no direct evidence that [he] shot Mr. Wynn, but even the circumstantial evidence was extremely weak." The government responds that "[t]he evidence was more than sufficient to show [Mr.] Cullison's guilt of the crimes charged, either as a principal or as an aider and abettor." We review the sufficiency of the evidence in the light most favorable to the

government, giving it the benefit of all reasonable inferences. *See Patterson v. United States,* 479 A.2d 335, 337–38 (D.C. 1984). We defer to the jury with respect to credibility· determinations and the weighing of the evidence. *See McCoy v. United States,* 781 A.2d 765, 768 (D.C. 2001). "It is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *In re M.I.W.,* 667 A.2d 573, 575 (D.C.1995) (quoting *Gayden v. United States,* 584 A.2d 578, 580 (D.C.1990)) (other citation and internal quotation marks omitted); *see also Lewis v. United States,* 767 A.2d 219, 222 (D.C. 2001).

Three government eyewitnesses implicated Mr. Cullison in the murder of Mr. Wynn. Mr. Proctor saw the arrest of Shannon Battle on the day of Mr. Wynn's murder. About twenty minutes later, he observed Mr. Ford, Hartridge and Cullison in a back alley on K Street, S.W., with Mr. Paris. Mr. Hartridge was holding Mr. Paris by his shirt collar, and Mr. Cullison stood "within a foot" of Mr. Paris and "had a gun in his hand." Mr. Proctor eventually left the alley and proceeded to Delaware and K, S.W. where he saw Mr. Wynn "lying on the fence," with Mr. Hartridge "[s]tanding in front of [him]." Mr. Ford and Mr. Cullison were nearby. Mr. Proctor spoke to Mr. Wynn and Mr. Hartridge and then walked "[a]cross the street." He heard gunshots, turned around and saw Mr. Ford shooting Mr. Wynn. More gunshots followed.

On the day of Mr. Wynn's murder, Mr. Paris watched the police arrest Mr. Battle, and saw Mr. Hartridge "acting wild" while talking to the police. Mr. Cullison and Mr. Ford also were present. Mr. Paris went to the alley in back of his Southwest home on Delaware Avenue where he saw the appellants close up. Mr. Ford had a gun and Mr. Cullison had a ".38" in his hand. Mr. Paris went home momentarily but left his house a few minutes later. He heard gunshots, "spaced apart"; the first shots sounded as though they were from "a semiautomatic gun" and the next from a revolver. Mr. Paris returned inside his home, looked out the widow and saw Mr. Cullison "running" with a gun in his hand.

Ms. Givens was standing near the corner of Delaware Avenue and K Street, S.W. on the day of Mr. Wynn's murder when she heard a gunshot. Upon looking, she saw Mr. Wynn in the middle of the street, turning around in a circle and saying, "ouch." After he fell to the ground, Mr. Hartridge and Mr. Cullison were standing "[o]ver top of [Mr. Wynn]." Although they had their backs to Ms. Givens, she saw them "unloading the gun." Mr. Hartridge and Mr. Cullison "went hand-to-hand to each other like they were switching something around." Mr. Hartridge "was kicking" Mr. Wynn.

If reasonable jurors believed the testimony of these witnesses, as they apparently did, and drew reasonable inferences from the testimony, they could reasonably conclude that the government presented sufficient evidence beyond a reasonable doubt to convict Mr. Cullison of the lesser-included offense of second-degree murder while armed and the weapons charges lodged against him, either as a principal or as an aider and abettor. *See Murchison v. United States,* 486 A.2d 77, 81 (D.C.1984). Thus, although the prosecutor misstated evidence by placing a gun in Mr. Cullison's hand on 1 Street two weeks after Mr. Wynn's murder, it is unlikely that that misstatement alone substantially prejudiced him by prompting the jury to convict him of Mr. Wynn's murder solely because he possessed a gun two weeks later on I Street, particularly since the government

presented a very strong case against Mr. Cullison based on the testimony of eyewitnesses to the murder of Mr. Wynn two weeks earlier. *See Freeman, supra,* 689 A.2d at 584. Consequently, we reject Mr. Cullison's sufficiency argument.

■ Mr. Cullison's argument that the identification procedure used with Ms. Lee was unduly suggestive is unpersuasive. His argument in his brief revolves around the testimony of Ms. Lee at trial that she had "never seen that boy before in [her] life," that the only person Ms. Lee did not know in the array was Mr. Cullison, and that Sergeant Wagner used unduly suggestive words in showing the photo array to Ms. Lee. However, Mr. Cullison does not mention any procedure used by the police in presenting the photo array to Ms. Lee that "was unnecessarily suggestive and conducive to irreparable misidentification." *Smith v. United States,* 777 A.2d 801, 805 (D.C.2001). In fact, he does not contend that Mr. Cullison's photo "st[ood] out dramatically" from the other photos in the array. *See Henderson v. United States,* 527 A.2d 1262, 1268 (D.C.1987). Sergeant Wagner's testimony revealed that the array had been put together with persons whom Ms. Lee was expected to recognize, and she did. Moreover, Sergeant Wagner uttered no words that would sway Ms. Lee's identification one way or the other. He said that she "might recognize people in the photographs in the stack or might not and that persons referred to during the interview might be in the stack or might not." He also asked her to tell him what she knew about each of the persons whose photograph was depicted. Our review of Sergeant Wagner's description of the photo array process and his interview of Ms. Lee satisfies us that the identification procedure was not "unnecessarily suggestive and conducive to irreparable misidentification." *Smith, supra,*

777 A.2d at 805; *see Gregg v. United States,* 754 A.2d 265, 267–68 (D.C.2000), *cert. denied,* 531 U.S. 980, 121 S.Ct. 430, 148 L.Ed.2d 438 (2000).

**Mr. Ford's Confession**

■ Mr. Ford contends that "[t]he government improperly introduced [his] purported confession at trial." The introduction was improper, he claims, because the "purported confession" was admitted into evidence during the impeachment of Anna Boxley–Davis with her grand jury testimony, but since she repudiated that testimony, she was "unavailable for cross-examination," and "[h]er prior testimony was therefore hearsay." He argues, furthermore, it violated the Confrontation Clause of the Sixth Amendment to the Constitution of the United States.

Ms. Boxley–Davis told the grand jury that on the day of Mr. Wynn's murder, Mr. Ford came to her home and said, "I had to do it, I had to do it, Anna Boxley." When Ms. Boxley–Davis asked what he had to do, Mr. Ford replied, "I had to kill him because he jumped out there." The government maintains that the admission of the confession was not improper because Ms. "Boxley–Davis was available for full cross-examination at trial." We review Mr. Ford's constitutional claim *de novo. See Newby v. United States,* 797 A.2d 1233, 1239 (D.C.2002). We review his evidentiary claim, that the trial court improperly admitted the confession under D.C.Code § 14–102 (2001), for abuse of discretion.

The record shows that the government granted immunity to Ms. Boxley–Davis. Therefore, she was available for cross-examination by counsel for Mr. Ford. Counsel decided not to cross-examine her, apparently for tactical reasons, since cross-examination might open up other parts of Ms. Boxley–Davis' grand jury testimony

that were unfavorable to Mr. Ford. In short, Mr. Ford was presented with the opportunity to cross-examine Ms. Boxley–Davis, and that is all that was constitutionally required, or mandated under D.C.Code § 14–102(b). *See Carey v. United States,* 647 A.2d 56, 59 (D.C.1994); *see also McConnaughey, supra,* 804 A.2d at 339–40; *Bell v. United States,* 790 A.2d 523, 528–29 (D.C.2002); *Sparks v. United States,* 755 A.2d 394, 399–400 (D.C.2000). Moreover, we see no abuse of discretion in the admission of the testimony under § 14–102.

**The Second Amendment Argument**

Finally, all of the appellants challenge their convictions for carrying a pistol without a license. This issue was not raised in the trial court. Where the challenge has not been raised in the trial court, we consistently have declined to consider it for the first time on appeal. *See Mitchell v. United States,* 746 A.2d 877, 885 n. 11 (D.C.2000). Furthermore, under *Sandidge v. United States,* 520 A.2d 1057 (D.C.1987), *cert. denied,* 484 U.S. 868, 108 S.Ct. 193, 98 L.Ed.2d 145 (1987), a panel of this court rejected a Second Amendment challenge to the CPWL statute, and we are bound by that decision, unless it is overturned by the en banc court. *See Barron v. United States,* 818 A.2d 987, 993 n. 7 (D.C.2003); *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971).

For the foregoing reasons, we affirm the judgment of the trial court with respect to the convictions of all of the appellants.

*So ordered.*

GLICKMAN, Associate Judge,
dissenting in part:

"It is axiomatic that the right to a speedy trial is a fundamental constitutional right." *Ante* at 207 (internal quotation marks and citations omitted). So we have said, but flexible judicial application of the mandated four-factor balancing test repeatedly proves how "necessarily relative" rather than essentially fundamental the prized speedy trial right turns out to be in reality. *Barker v. Wingo,* 407 U.S. 514, 522, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (internal quotation marks and citation omitted). The Sixth Amendment terms it a "right," but perhaps, regrettably, it would be more accurate to call it a speedy trial "preference"—a preference readily and unpredictably outweighed by numerous other factors, such as convenience. If we shrink from that characterization, and faithfully seek to preserve the guarantee that "[i]n *all* criminal prosecutions, the accused *shall enjoy* the right to a speedy ... trial," U.S. CONST., Amend. VI (emphasis added), we are obligated to apply the *Barker* balancing test with rigor and objectivity, and to resist trimming the right to avoid overturning convictions for serious offenses.

Elastic as I recognize the *Barker* balancing test is, I submit that the opinion of the majority stretches it to the breaking point in rejecting appellant Hartridge's speedy trial claim. Rather than strain to ignore or deny the obvious, I would acknowledge that in this case—unlike in every past case in which this court has found no deprivation of a speedy trial—all four relevant factors weigh heavily in favor of finding that Hartridge's Sixth Amendment right was violated.

**(1) Length of the Delay.** Two-and-one-half years elapsed between Hartridge's arrest and the start of his trial.[1]

---

1. Before the trial proper got under way, nearly three months were taken up with hearings on the defendants' various motions. Treating the starting date of the motions hearings as the relevant trial commencement date, the majority therefore measures the length of the

Under settled case law, this delay was clearly "uncommonly long," "presumptively prejudicial," and well beyond the threshold that is "unreasonable enough to trigger the *Barker* enquiry." *Doggett v. United States*, 505 U.S. 647, 651–52 & 652 n. 1, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) (internal quotation marks and citations omitted). *See also Hammond v. United States*, 880 A.2d 1066, 1079 (D.C.2005) ("A delay of a year or more between arrest and trial gives prima facie merit to a claim that a deprivation of an accused's speedy trial rights has occurred.") (quoting *Tribble v. United States*, 447 A.2d 766, 768 (D.C. 1982)). In evaluating the weight to be given this factor, I think it no sufficient answer to say that we have—on rare occasions in unique circumstances—"tolerated" or "countenanced" even more egregious delays. *Ante* at 208. It is the government's burden to "justify" delay in excess of a year, and the longer the period of delay, the heavier that burden is. *Graves v. United States*, 490 A.2d 1086, 1091 (D.C. 1984) (en banc).

(2) **Reasons for the Delay.** In categorizing the various reasons for the delay of Hartridge's trial as either significant, neutral, neutral plus, or neutral minus, it is easy to lose sight of the fact that all of them—including the government's desire to try Hartridge jointly with his repeatedly unready co-defendants[2]—are "weighed more or less heavily *against* the government." *Ante* at 209 (quoting *Hammond,* 880 A.2d at 1080) (emphasis added). That is, *none* of the proffered explanations enables the government to shoulder its burden of "justifying" the excessive delay. More significantly, I think the majority opinion tilts the balance too much in favor of preserving joinder of co-defendants at all costs, even when it means greatly delaying the trial of an incarcerated defendant who is invoking his right to be tried speedily. I grant that "[j]oinder of cases is favored, where appropriate, because it fosters efficient use of judicial and prosecutorial resources and decreases the burden on citizens who are called as witnesses." *Ante* at 210 (quoting *Adams v. United States*, 466 A.2d 439, 445 (D.C. 1983)).[3] I appreciate, too, that in some cases (including this one) the government may be concerned that its witnesses are at risk or fearful and would be reluctant to return for a second trial. For those reasons, a modicum of additional delay incurred to accommodate the conflicting schedules and legitimate needs of all the parties and their attorneys is a reasonable

---

pretrial delay in this case as two years and three months rather than two-and-a-half years. While I do not consider the three-month difference to be material to my speedy trial analysis, I think two-and-a-half years may be a better measure of the pretrial delay that Hartridge was obliged to endure on account of the trial court's refusal to expedite his trial by severing his case from the cases of his co-defendants. Had the court granted severance, I am confident it would have conducted the hearings on Hartridge's motions alone in appreciably less than three months (though precisely how much less I cannot say).

**2.** *See Hammond,* 880 A.2d at 1081 ("[T]he government bears responsibility for delays oc- casioned by requests of co-defendants, since the government chooses to try defendants jointly."); *Ruffin v. United States,* 524 A.2d 685, 688–89 (D.C.1987) (same); *Townsend v. United States,* 512 A.2d 994, 999 (D.C.1986) (stating that government's desire for joint trial "does not excuse" the resulting delay "or render it neutral"); *Gaffney v. United States,* 421 A.2d 924, 928 (D.C.1980) ("While much of the delay was attributable to Gaffney's unpreparedness, the consequential delay of Engram's trial is somewhat weighed against the government because the government chose to try the appellants jointly.").

**3.** I find it a bit ironic, though, that excessive delay should be deemed acceptable in the interests of efficiency.

price to require each individual defendant to pay so that all properly joined co-defendants may be tried together.[4] But there are limits to the amount of delay that should be deemed tolerable for joinder purposes (i.e., deemed not to "weigh heavily against the government") over a defendant's speedy trial objections, especially where the defendant is held without bond pending trial. I think those limits plainly were exceeded in Hartridge's case, where the government concedes that nearly sixteen months of delay were "precipitated by co-defendants' counsels or by the difficulty of coordinating the schedules of the trial court and counsel."

Simply put, the non-constitutional reasons of policy that favor joinder—efficient use of resources and decreasing the burden on witnesses—are not so compelling that they outweigh the "fundamental" policy enshrined in the Constitution. Enforcement of a defendant's right to a speedy trial may necessitate a "sensitive balancing" of relevant factors, *Barker*, 407 U.S. at 533, 92 S.Ct. 2182, but that necessity is not an excuse to whittle away the Sixth Amendment guarantee in favor of every other interest that may be advanced. A proper balancing must be "sensitive" to the high value we place on the right to a speedy trial. A defendant's right to a speedy trial therefore must not be held hostage to co-defendants' prolonged inability to proceed with trial, just as it must not be held hostage to the prosecution's inability to do so.

(3) **Assertion of the Right to a Speedy Trial.** "The defendant's assertion of his speedy trial right, the Supreme Court has said, 'is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.'"

*Graves*, 490 A.2d at 1098 (quoting *Barker*, 407 U.S. at 531–32, 92 S.Ct. 2182). In my view, the most serious misjudgment in the majority opinion's analysis of Hartridge's claim is its failure to give due weight to his repeated and insistent demand for a speedy trial. I am not sure this court has ever seen a stronger showing on the third *Barker* factor. As the majority opinion itself recounts, *ante* at 205–07, Hartridge asked for a speedy trial at his arraignment on April 12, 1994, and requested a severance in order to expedite his trial date; objected to a continuance of the trial date at a status conference on July 19, 1994; reiterated his objection to any further postponement of the trial date at a status conference on October 6, 1994; opposed a continuance of the trial date on November 15, 1994; sought a severance at a pretrial conference on April 14, 1995, so that his scheduled May 31 trial date would not be cancelled; followed up that request with a written speedy trial motion (which asked again for severance and trial on May 31 as an alternative to dismissal); reminded the trial court of this still-pending motion on June 23, 1995; personally as well as through his counsel opposed yet another delay of his trial at a status hearing on September 12, 1995; reiterated that opposition on September 29, 1995; and renewed his request for a severance on January 29, 1996, so that his trial could proceed without further delay. Hartridge never requested that his trial be continued. His invocation of his Sixth Amendment right to a prompt trial was not "merely *pro forma*," *Hammond*, 880 A.2d at 1085, nor was it untimely, erratic, insincere or frivolous. The trial court was well aware from the outset that Hartridge was consistently demanding not to be de-

---

**4.** In *Ruffin, Townsend, Adams,* and *Gaffney,* only a few months of the pretrial delay was attributable to joinder of co-defendants.

prived of his right to a speedy trial and was not acquiescing in the continuances · requested by other parties. If "the assertion of the right must be considered in light of its 'frequency and force,'" *ante* at 210 (quoting *Hammond,* 880 A.2d at 1086, and *Dickerson v. United States,* 650 A.2d 680, 685 (D.C.1994)), Hartridge's assertions strongly support his claim. The majority's contrary conclusion rests on an unduly selective, blinkered view of the record.

(4) **Prejudice.** "[T]he Speedy Trial Clause's core concern is impairment of liberty." *United States v. Loud Hawk,* 474 U.S. 302, 312, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986). First and foremost, the Clause was intended "to prevent oppressive pretrial incarceration." *Barker,* 407 U.S. at 532, 92 S.Ct. 2182. Thus, "[t]he speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial...." *United States v. MacDonald,* 456 U.S. 1, 8, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982). Given these principles, it cannot be denied that two-and-one-half years of pretrial incarceration—two-and-one-half years sitting in the restrictive and uncomfortable confines of the D.C. Jail, one's life on indefinite hold, waiting for one's trial to commence—is very substantial prejudice,

of the precise kind that the Speedy Trial Clause was meant to avoid.[5]

Rather than admit that Hartridge unquestionably did suffer palpable prejudice from his prolonged incarceration, the majority opinion focuses its sights elsewhere and faults Hartridge for his inability to prove that his defense at trial was impaired.[6] His argument on that score, the majority opinion states, "lacks specificity." *Ante* at 211. Then, from Hartridge's inability to demonstrate with specificity that he was hindered in his defense, the majority opinion leaps incautiously to the conclusion that there was no such prejudice—a conclusion that "weighs heavily" in the majority's determination of Hartridge's speedy trial claim. *Id.* (citations omitted). There are two things fundamentally wrong with the majority's reasoning.

First, and most important, whether or not impairment of one's defense is "the most serious" type of prejudice from the denial of a speedy trial, *Barker,* 407 U.S. at 532, 92 S.Ct. 2182, it is not the only type, and the absence of such impairment is by no means fatal to Hartridge's speedy trial claim. *Graves,* 490 A.2d at 1103. Even if it is true that Hartridge's defense at trial was not impaired, he suffered other cognizable and substantial prejudice on ac-

---

**5.** We cannot dismiss this most basic form of prejudice on the ground that Hartridge ultimately was found guilty at trial and sentenced to a lengthy prison term, nor does anyone suggest that we should. The majority opinion discounts Hartridge's lengthy pretrial incarceration, however, because greater delay "will be tolerated" in cases involving "more serious and complex... charge[s]," *ante* at 211 (internal quotation marks and citations omitted). On the question of prejudice from pretrial incarceration (as opposed to the mere length of the delay), this statement is a *non sequitur;* that aside, the short rejoinder is that the seriousness and complexity of the charges in this case were not the reason Hartridge's trial was delayed. Both the prosecution and

Hartridge were ready for trial not long after Hartridge was arraigned.

**6.** The majority opinion also discounts—rather cavalierly, some might think—the anxiety and concern that Hartridge "may have suffered" while he awaited trial on a first-degree murder charge, *ante* at 211, noting that he points to no specific impact on his health or other aspects of his life. Although I find the majority's reasoning unpersuasive, I think it unnecessary to belabor the point. The anxiety and concern that an accused "may" suffer are a form of prejudice separate and distinct from that of oppressive pretrial incarceration. *See Barker,* 407 U.S. at 532, 92 S.Ct. 2182; *Graves,* 490 A.2d at 1101.

count of what one court has called "the second most important factor"—his lengthy pretrial incarceration. *Jackson v. Ray*, 390 F.3d 1254, 1264 (10th Cir.2004); *see also Berry v. State*, 93 P.3d 222, 237 (Wy.2004) (holding that 720 days of pretrial detention "weighs heavily in favor" of defendant's speedy trial claim). As the Supreme Court explained in *Barker*, "[t]he time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness.... The time spent in jail is simply dead time." 407 U.S. at 532–33, 92 S.Ct. 2182. "Imposing those consequences on anyone who has not yet been convicted is serious." *Id.* at 533, 92 S.Ct. 2182.

Second, the majority's argument that Hartridge did not present affirmative evidence of prejudice to his defense

> takes it only so far: consideration of prejudice is not limited to the specifically demonstrable, and ... affirmative proof of particularized prejudice is not essential to every speedy trial claim.... [Citations omitted.] *Barker* explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown." 407 U.S. at 532, 92 S.Ct. 2182.... Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, *see Loud Hawk*, [474 U.S.] at 315, 106 S.Ct. 648 it is part of the mix of relevant facts, and its importance increases with the length of delay.

*Doggett*, 505 U.S. at 655–56, 112 S.Ct. 2686. If we take seriously what the Su-

preme Court has said about "presumptive prejudice," then the burden must be on the government to rebut the presumption, i.e., in the present case, to demonstrate affirmatively that Hartridge's defense suffered no material impairment as a result of the excessive pretrial delay. The majority opinion does not suggest that the government has carried that burden. *Cf. Doggett*, 505 U.S. at 658 n. 4, 112 S.Ct. 2686 ("While the Government ably counters Doggett's efforts to demonstrate particularized trial prejudice, it has not, and probably could not have, affirmatively proved that the delay left his ability to defend himself unimpaired.").

To my colleagues, *Doggett* "implies" that Hartridge's speedy trial claim cannot succeed "absent either serious fault by the government in causing the lapse of time *or* specific prejudice to preparation of the defense." *Ante* at 212. The case implies no such thing; I submit my colleagues misread the Supreme Court's opinion. The threshold legal issue in *Doggett* and the Court's resolution of it were the opposite of what my colleagues seem to think they were. The Court's prior cases had said that "unreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including 'oppressive pretrial incarceration,' 'anxiety and concern of the accused,' and 'the possibility that the [accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence." 505 U.S. at 654, 112 S.Ct. 2686 (citations omitted). In *Doggett*, however, the government contended (in rather striking contrast to its present position) that the Speedy Trial Clause is not intended to prevent prejudice to the defense, but is intended *only* to prevent oppressive pretrial incarceration and anxiety of the accused; i.e., that *only* pretrial deprivation of liberty and anxiety could be relied upon to establish a speedy trial violation. *See* 505 U.S. at 654, 112 S.Ct. 2686;

*see also id.* at 660, 112 S.Ct. 2686 *et seq.* (Thomas, J., dissenting).[7] While the Supreme Court held that the Speedy Trial Clause is indeed concerned as well with prejudice to the accused's defense, by no stretch of the imagination did the Court cast doubt on the Clause's unquestioned purpose of preventing oppressive pretrial incarceration and anxiety on the part of the accused. My colleagues' mistaken inference that impairment of the accused's ability to defend himself is, after *Doggett,* a virtual *sine qua non* of a successful speedy trial claim, founders on the Supreme Court's explicit holding that "the speedy trial enquiry must weigh the effect of delay on the accused's defense *just as it has to weigh any other form of prejudice that Barker recognized."* *Id.* at 655, 112 S.Ct. 2686 (emphasis added).

In support of their reading of *Doggett,* my colleagues quote a single brief passage out of context—the Court's statement that "if the Government had pursued Doggett with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail ... as a matter of course however great the delay, *so long as Doggett could not show specific prejudice to his defense." Ante* at 212 (quoting *Doggett,* 505 U.S. at 656, 112 S.Ct. 2686) (emphasis added). In context, this statement merely reflects the fact that prejudice to his defense was the *only* prejudice Doggett claimed or could claim. *See* 505 U.S. at 654, 112 S.Ct. 2686. Because Doggett was not detained before trial, he could not claim prejudice from pretrial incarceration (and, as he was unaware of the pending criminal charges, he suffered no pretrial anxiety). At most, therefore, the Supreme Court's statement means only that in the absence of government fault, an *unincarcerated* defendant will need to show specific prejudice to his defense in order to prevail on a speedy trial claim. The statement cannot logically or fairly be taken to imply that a defendant who has been deprived of his liberty for a prolonged period also will need to show such prejudice.[8]

Thus, I think that the fourth *Barker* factor, like the other three if not more so, weighs heavily in favor of finding a deprivation of Hartridge's Sixth Amendment right. I cannot fathom how the majority can dismiss two-and-one-half years of imprisonment without trial and say that Hartridge's claim of prejudice "is simply unpersuasive on this record." *Ante* at 213.

In sum, to return now to where I began in this dissent, it seems to me that if we apply the *Barker* balancing test with rigor and objectivity, the only conclusion we properly can reach is that Hartridge was deprived of his Sixth Amendment right to a speedy trial. While this court has issued many past decisions finding no speedy trial violation, I am unaware of any such decision (and the majority opinion does not cite a single one) with a comparably strong showing by the defendant on each of the

7. The government argued that "the effect of delay on adjudicative accuracy is exclusively a matter for consideration under the Due Process Clause." *Id.* at 655 n. 2, 112 S.Ct. 2686.

8. *Doggett* also demonstrates the fallacy in any suggestion, *see ante* at 212 n. 17, that more than one form of cognizable prejudice must be shown for a speedy trial claim to succeed in the absence of serious governmental fault. Under *Doggett,* proof that the defendant sustained even one form of prejudice may suffice. None of the cases cited by the majority indicate otherwise, for the defendants in *United States v. Stephenson,* 891 A.2d 1076, 1076 (D.C.2006), *District of Columbia v. Cruz,* 828 A.2d 181, 183 (D.C.2003), and *Akins v. United States,* 679 A.2d 1017, 1024 (D.C.1996), suffered no (or virtually no) prejudice whatsoever of any type the Speedy Trial Clause was intended to prevent.

four *Barker* factors.[9] Accordingly, I am obliged to dissent from the affirmance of Hartridge's convictions.

---

**9.** In *Hammond,* for example, this court found no speedy trial violation even though fifty-four months elapsed before Hammond's trial was held. But that case is distinguishable from this one in three crucial respects. First, unlike Hartridge, Hammond acquiesced in much of the delay (some of which was attributable to his own counsel's scheduling difficulties), and his assertion of a right to a speedy trial was belated, *pro forma*, and undercut by his "expressed" preference not to be tried until *after* his co-defendant. 880 A.2d at 1086. Second, unlike Hartridge, Hammond did not suffer prejudice from pretrial incarceration, because he was lawfully incarcerated anyway on other, unrelated federal charges "during most of the period of delay." *Id.* at 1086. (Nor did Hammond establish other significant prejudice.) Third, unlike in Hartridge's case, sixteen months of the pretrial delay in Hammond's case was deemed "justified" (almost all the balance was given "neutral" weight) because it related to the government's successful interlocutory appeal of an evidence suppression ruling and the government sought to expedite the appeal (while Hammond did not). *Id.* at 1083–85, 1108–09. Thus, unlike in this case, in *Hammond* only the first *Barker* factor, the length of the delay, strongly supported the speedy trial claim.